# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 08-108V
### (To be published)

* * * * * * * * * * * * * * * * * * * * * * * * *
HAROLD HARDY, III and       *
TIFFANY ANN HARDY-BELL,     *
*legal representatives of HH, a minor*,    *         Filed: August 16, 2016
                       *
                       *
            Petitioners,      *         Vaccine Act Fees and Costs;
                       *         Autism Case; Reasonable Basis
       v.                 *
                       *
SECRETARY OF HEALTH AND    *
HUMAN SERVICES,            *
                       *
            Respondent.     *
* * * * * * * * * * * * * * * * * * * * * * * * *

*Michael L. Cave, Baton Rouge, LA, for Petitioners.*
*Traci Patton, Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING ATTORNEYS' FEES AND COSTS

**HASTINGS,** *Special Master*.

      In this case under the National Vaccine Injury Compensation Program (hereinafter "the Program"[1]), Petitioners seek, pursuant to 42 U.S.C. § 300aa-15(e)(1), an award for attorneys' fees and other costs incurred in attempting to obtain Program compensation. After careful consideration, I have determined to grant the request in part, but to deny it in significant part, because it was not reasonable for Petitioners to take to trial their very weak case contending that HH's autism spectrum disorder or her autistic symptoms were vaccine-related.

---

[1]     The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 *et seq.* (2012 ed.). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. (2012 ed.). The statutory provisions defining the Program are also sometimes referred to as the "Vaccine Act."

# I

# BACKGROUND LAW CONCERNING ATTORNEYS' FEES AND COSTS AWARDS

## A.  General

Special masters have the authority to award "reasonable" attorneys' fees and litigation costs in Vaccine Act cases.  §300aa–15(e)(1).  This is true even when a petitioner is unsuccessful on the merits of the case, if the petition was filed in good faith and with a reasonable basis.  *Id.* "The determination of the amount of reasonable attorneys' fees is within the special master's discretion." *Saxton v. HHS,* 3 F.3d 1517, 1520 (Fed. Cir. 1993); *see also Shaw v. HHS,* 609 F.3d 1372, 1377 (Fed. Cir. 2010).

Further, as to all aspects of a claim for attorneys' fees and costs, the burden is on the *petitioner* to demonstrate that the attorneys' fees claimed are "reasonable." *Sabella v. HHS,* 86 Fed. Cl. 201, 215 (2009); *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983); *Rupert v. HHS,* 52 Fed. Cl. 684, 686 (2002); *Wilcox v. HHS,* No. 90–991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997).  The petitioner's burden of proof to demonstrate "reasonableness" applies equally to *costs* as well as attorneys' fees.  *Perreira v. HHS,* 27 Fed. Cl. 29, 34 (1992), *aff'd,* 33 F.3d 1375 (Fed. Cir. 1994).

One test of the "reasonableness" of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation, would be willing to pay for such expenditure.  *Riggins v. HHS,* No. 99–382V, 2009 WL 3319818, at *3 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd by unpublished order* (Fed. Cl. Dec. 10, 2009), *aff'd,* 406 Fed. App'x. 479 (Fed. Cir. 2011); *Sabella v. HHS,* No. 02–1627V, 2008 WL 4426040, at *28 (Fed. Cl. Spec. Mstr. Aug. 29, 2008), *aff'd in part and rev'd in part,* 86 Fed. Cl. 201 (2009). In this regard, the United States Court of Appeals for the Federal Circuit has noted that:

> [i]n the private sector, 'billing judgment' is an important component in fee setting.  It is no less important here.  Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Saxton*, 3 F.3d at 1521 (emphasis in original) (quoting *Hensley*, 461 U.S. at 433–34).  Therefore, in assessing the number of hours reasonably expended by an attorney, the court must exclude those "hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434; *see also Riggins*, 2009 WL 3319818, at *4.

The Federal Circuit has also made clear that special masters may rely on their prior experience in making reasonable fee determinations, without conducting a line-by-line analysis of the fee bill, and are not required to rely on specific objections raised by respondent.  *See Saxton*, 3 F.3d at 1521; *Sabella*, 86 Fed. Cl. 201, 209 (2009); *see also Wasson v. HHS,* 24 Cl. Ct. 482, 484, 486 (1991), *aff'd,* 988 F.2d 131 (Fed. Cir. 1993) (holding that, in determining a reasonable number of hours expended in any given case, a special master may rely on her experience with the Vaccine Act and its attorneys, without basing her decision on a line-by-line

examination of the fee application).  A unanimous Supreme Court has articulated a similar holding:

> We emphasize, as we have before, that the determination of fees "should not result in a second major litigation." The fee applicant (whether a plaintiff or a defendant) must, of course, submit appropriate documentation to meet "the burden of establishing entitlement to an award." But trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of "the district court's superior understanding of the litigation." We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Fox v. Vice*, 563 U.S. 826, 838 (2011) (internal citations omitted).

### B. *Reasonable basis*

As noted above, even if a petitioner is unsuccessful in obtaining Vaccine Act compensation for an injury, a special master "may" award fees and costs. (§300aa–15(e)(1).)  Of course, as recently noted by Chief Judge Campbell-Smith, the statutory use of the term "may" means that a special master can also, in his or her discretion, *decline* to award any attorneys' fees or costs to a petitioner whose case is unsuccessful on the merits, if the special master does not find that an award is deserved under all the circumstances. *Chuisano v. HHS*, 116 Fed. Cl. 276, 285-286 (2014).  In practice, special masters have generally awarded fees, or declined to do so, based upon whether there was a "reasonable basis" for the claim advanced by the petitioners.

The statute and legislative history afford no guidance as to the precise meaning of "reasonable basis," and the case law is relatively scant.  The Chief Judge of this Court has explained that not all claims should be found to have a reasonable basis, and that whether a reasonable basis exists is determined by the "totality of the circumstances." *Chuisano v. HHS*, 116 Fed. Cl. at 285-286.  A special master has "discretion" in determining whether a reasonable basis existed. *Murphy v. HHS*, 30 Fed. Cl. 60, 61 (1993), *aff'd without opinion*, 48 F.3d 1236 (1995) (judge affirmed a denial of reasonable basis, noting that the determination concerning reasonable basis is reviewed under an "abuse of discretion" standard).  In other cases in which, as in *Murphy*, a judge affirmed a denial of reasonable basis, the court remarked that the special master's discretion is "wide" (*Perreira v. HHS*, 27 Fed. Cl. 29, 34 (1992)), and "very broad" (*Silva v. HHS*, 108 Fed. Cl. 401, 405 (2012)).  In fact, in *Silva*, the court remarked that it is "difficult to imagine a broader grant of authority and discretion."  108 Fed. Cl. at 405.

In a significant number of Vaccine Act cases, special masters have found that no reasonable basis existed either to file the case, or to prosecute it beyond a certain point.  In most of those instances, the petitioner either did not seek review, or the special master's finding concerning reasonable basis was upheld on review.  *See, e.g., Somosot v. HHS*, No. 13-710V, 2014 WL 6536059 (Fed. Cl. Spec. Mstr. Oct. 31, 2014), *aff'd*, 120 Fed. Cl. 716 (2015); *Chuisano v. HHS*, No. 07-452V, 2013 WL 6234660 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), *aff'd*, 116 Fed. Cl. 276 (2014); *Cortez v. HHS*, No.  09-176V, 2014 WL 1604002 (Fed. Cl. Spec. Mstr.

Mar. 26, 2014); *Silva v. HHS*, No. 10-101V, 2012 WL 2890452 (Fed. Cl. Spec. Mstr. June 22, 2012), *aff'd*, 108 Fed. Cl. 401 (2012); *Browning v. HHS*, No. 07-453V, 2010 WL 4359237 (Fed. Cl. Spec. Mstr. Sept. 27, 2010); *Brown v. HHS*, No. 99-539V, 2005 WL 1026713 (Fed. Cl. Spec. Mstr. Mar. 11, 2005); *Smith v. HHS*, No. 91-057V, 1992 WL 210999 (Cl. Ct. Spec. Mstr. Aug. 13, 1992); *Livingston v HHS*, No. 12-268V, 2015 WL 4397705 (Fed. Cl. Spec. Mstr. June 26, 2015); *Rydzewski v. HHS*, No. 99-571V, 2008 WL 382930 (Fed. Cl. Spec. Mstr. Jan. 29, 2008); *McCabe v. HHS*, No. 91-1540V, 1993 WL 135860 (Fed. Cl. Spec. Mstr. Apr. 15, 1993); *Stevens v. HHS*, No. 90-221V, 1992 WL 159520 (Cl. Ct. Spec. Mstr. June 9, 1992), *aff'd*, 996 F.2d 1236 (Fed. Cir. 1993)(unpublished).

One key opinion of the United States Court of Appeals for the Federal Circuit, discussing the "reasonable basis" requirement in a Vaccine Act case, is *Perreira v. HHS*, 33 F. 3d 1375 (Fed. Cir. 1994). In *Perreira*, the special master concluded that the petitioners had a reasonable basis for *initially filing* the petition and for the first part of their prosecution of the case, but concluded that there was *no reasonable basis* for pursuing the case beyond the point when the Perreiras submitted an expert report, at which time the Perreiras' attorneys should have realized that their expert's theory was plainly deficient to demonstrate causation. 33 F.3d at 1376. The special master denied fees and costs for work performed after that point, in taking the case to an evidentiary hearing. *Id.* Both the Court of Federal Claims (27 Fed. Cl. 29 (1992)), and the Federal Circuit (33 F.3d at 1376-77) affirmed.

The Court of Federal Claims judge rejected the Perreiras' argument that they automatically passed the "reasonable basis" test because they were relying on an expert's report, finding that argument to be "unreasonable." 27 Fed. Cl. at 33-34. The judge found that under all the circumstances of the case, for the petitioners to take the case to an evidentiary hearing "with no support in the contemporaneous medical records," and with no "*reputable* medical opinion or scientific studies" (emphasis added) was also "unreasonable." *Id.* at 34.

The Federal Circuit agreed with the court below, observing that "counsel's duty to zealously represent their client does not relieve them of their duty to the court to avoid frivolous litigation." 33 F.3d at 1377. The appellate court added that Congress did not intend that every claimant qualify for an attorneys' fee award "by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury." *Id.* The court concluded that the special master did not err in determining that the Perreiras "no longer had a reasonable basis for claiming causation in-fact" after their expert report was filed. *Id.*

## II

## BACKGROUND: THE OMNIBUS AUTISM PROCEEDING ("OAP")

This case is one of more than 5,400 cases filed under the Program in which petitioners alleged that conditions known as "autism" or "autism spectrum disorders" ("ASD")[2] were caused by one or more vaccinations.  A special proceeding known as the Omnibus Autism Proceeding ("OAP") was developed to manage these cases within the Office of Special Masters ("OSM").  A detailed history of the controversy regarding vaccines and autism, along with a history of the development of the OAP, was set forth in the six entitlement decisions issued as "test cases" for two theories of causation litigated in the OAP (see cases cited below), and will only be summarized here.

A group called the Petitioners' Steering Committee ("PSC") was formed in 2002 by the many attorneys who represented Vaccine Act petitioners who raised autism-related claims.  About 180 attorneys participated in the PSC.  Their responsibility was to develop any available evidence indicating that vaccines could contribute to causing autism, and eventually present that evidence in a series of "test cases," exploring the issue of whether vaccines could cause autism, and, if so, in what circumstances.  Ultimately, the PSC selected groups of attorneys to present evidence in two different sets of "test cases" during many weeks of trial in 2007 and 2008.  In the six test cases, the PSC presented two separate theories concerning the causation of ASDs.  The first theory alleged that the *measles* portion of the measles, mumps, rubella ("MMR") vaccine could cause ASDs.  That theory was presented in three separate Program test cases during several weeks of trial in 2007.  The second theory alleged that the mercury contained in *thimerosal-containing vaccines* could directly affect an infant's brain, thereby substantially contributing to the causation of ASD.  That theory was presented in three additional test cases during several weeks of trial in 2008.

Decisions in each of the three test cases pertaining to the PSC's *first* theory rejected the petitioners' causation theories.  *Cedillo v. HHS*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009) *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. HHS*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd* 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010); *Snyder v. HHS*, No. 01-162V,

---

[2]  "Autism Spectrum Disorder" is a *general* classification which as of 2010 included five different specific disorders: Autistic Disorder, Childhood Disintegrative Disorder, Asperger's Syndrome, Rett Syndrome, and Pervasive Developmental Disorder Not Otherwise Specified (PDD-NOS).  *King v. HHS*, No. 03-584V, 2009 WL 892296 at *5 (Fed. Cl. Spec. Mstr. Feb. 12, 2010).  The term "autism" is often utilized to encompass *all* of the types of disorders falling within the autism spectrum.  (*Id.*)  I recognize that since the OAP test cases, the consensus description of ASDs, contained now in the "DSM-V" as opposed to the prior "DSM-IV," revises the prior subcategories of ASD set forth in the first sentence of this footnote.  However, the DSM-V retains the same *general description* of ASDs.  An ASD is a serious form of neurodevelopmental disorder defined by a collection of symptoms and behaviors, including significant impairment of social interaction and language skills, and the presence of repetitive, stereotyped interests.  *E.g.*, *Snyder v. HHS*, No. 01-162V, 2009 WL 332044, at *31 (Fed. Cl. Spec. Mstr. Feb. 12, 2009).

2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 706 (2009).[3]   Decisions in each of the three "test cases" pertaining to the PSC's *second* theory also rejected the petitioners' causation theories, and the petitioners in each of those three cases chose not to appeal.  *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King v. HHS*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar 12, 2010); *Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

The "test case" decisions were comprehensive, analyzing in detail all of the evidence presented on both sides.  The three test case decisions concerning the PSC's *first* theory (concerning the MMR vaccine) totaled more than 600 pages of detailed analysis, and were solidly affirmed in many more pages of analysis in three different rulings by three different judges of the United States Court of Federal Claims, and in two rulings by two separate panels of the United States Court of Appeals for the Federal Circuit.  The three special master decisions concerning the PSC's *second* theory (concerning vaccinations containing the mercury-based preservative "thimerosal") were similarly comprehensive.

All told, the 11 lengthy written rulings by the special masters, the judges of the U.S. Court of Federal Claims, and the panels of the U.S. Court of Appeals for the Federal Circuit *unanimously rejected* the petitioners' claims, finding no persuasive evidence that either the MMR vaccine or thimerosal-containing vaccines could contribute in any way to the causation of autism.

Thus, the proceedings in the six "test cases" concluded in 2010.  Thereafter, the Petitioners in this case, and the petitioners in other cases within the OAP, were instructed to decide how to proceed with their own claims.  The vast majority of those autism petitioners elected either to withdraw their claims, or to request that the special master file a decision denying their claim on the written record, resulting in a decision rejecting the petitioner's claim for lack of support.  However, a small minority of the autism petitioners have elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses.  A number of such cases have gone to trial before a special master, and in the cases of this type decided thus far, all have resulted in *rejection* of petitioners' claims that vaccines played a role in causing their child's autism.  *See*, *e.g.*, *Henderson v. HHS*, No. 09-616V, 2012 WL 5194060 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2012) (autism not caused by pneumococcal vaccination); *Franklin v. HHS*, No. 99-855V, 2013 WL 3755954 (Fed. Cl. Spec. Mstr. Hastings May 16, 2013) (MMR and other vaccines found not to contribute to autism); *Coombs v. HHS*, No. 08-818V, 2014 WL 1677584 (Fed. Cl. Spec. Mstr. Hastings Apr. 8, 2014) (autism not caused by MMR or Varivax vaccines); *Long v. HHS*, No. 08-792V, 2015 WL 1011740 (Fed. Cl. Spec. Mstr. Hastings Feb. 19, 2015) (autism not caused by influenza vaccine); *Brook v. HHS*, No. 04-405V, 2015 WL 3799646 (Fed. Cl. Spec. Mstr. Hastings May 14, 2015) (autism not caused by MMR or Varivax vaccines); *Holt v. HHS*, No. 05-136V, 2015 WL 4381588 (Fed. Cl. Spec. Mstr. Vowell June 24, 2015) (autism not caused by hepatitis B vaccine); *Lehner v. HHS*, No. 08-554V, 2015 WL 5443461 (Fed. Cl. Spec. Mstr. Vowell July 22, 2015) (autism not caused by influenza vaccine); *Miller v. HHS*, No. 02-235V, 2015 WL 5456093 (Fed. Cl. Spec. Mstr. Vowell August 18, 2015) (ASD not caused by combination of vaccines); *Allen v HHS*, No. 02-1237V, 2015 WL 6160215 (Fed. Cl. Spec. Mstr. Vowell Sept. 26, 2015) (autism not caused by MMR vaccination); *R.K. v.*

---

[3]     The petitioners in *Snyder* did not appeal the decision of the U.S. Court of Federal Claims.

*HHS*, No. 03-632V, 2015 WL 10936124 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2015) (autism not caused by influenza vaccine), *aff'd* 2016 WL 552481 (Fed. Cl. J. Braden Feb. 12, 2016); *Hardy v. HHS*, No. 08-108V, 2015 WL 7732603 (Fed. Cl. Spec. Mstr. Hastings Nov. 3, 2015) (autism not caused by several vaccines); *Sturdivant v. HHS*, No. 07-788V, 2016 WL 552529 (Fed. Cl. Spec. Mstr. Hastings Jan. 21, 2016) (autism not caused by Hib and Prevnar vaccines); *R.V. v. HHS*, No. 08-504V, 2016 WL 3882519 (Fed. Cl. Spec. Mstr. Corcoran Feb. 19, 2016) (autism not caused by influenza vaccine), *aff'd*, 2016 WL 3647786 (Fed. Cl. June 2, 2016); *Murphy v. HHS*, No. 05-1063V, 2016 WL 3034047 (Fed. Cl. Spec. Mstr. Corcoran April 25, 2016) (autism not caused by DTaP or MMR vaccines) (on review).

In addition, some autism causation claims have been rejected *without trial*, at times over the petitioner's objection, in light of the failure of the petitioner to file plausible proof of vaccine-causation. *See, e.g., Waddell v. HHS*, No. 10-316V, 2012 WL 4829291 (Fed. Cl. Spec. Mstr. Campbell-Smith Sept. 19, 2012) (autism not caused by MMR vaccination); *Fester v. HHS*, No. 10-243V, 2016 WL 1745436 (Fed. Cl. Spec. Mstr. Dorsey April 7, 2016) (autism not caused by measles, mumps, rubella, and varicella (MMRV) vaccine); *Fresco v. HHS*, No. 06-469V, 2013 WL 364723 (Fed. Cl. Spec. Mstr. Vowell Jan. 7, 2013) (autism not caused by multiple vaccines); *Fesanco v. HHS*, No. 02-1770, 2010 WL 4955721 (Fed. Cl. Spec. Mstr. Hastings Nov. 9, 2010) (autism not caused by multiple vaccines); *Miller v. HHS*, No. 06-753V, 2012 WL 12507077 (Fed. Cl. Spec. Mstr. Hastings Sept. 25, 2012) (autism not caused by DTaP or MMR vaccines); *Blake v. HHS*, No. 03-31V, 2014 WL 2769979 (Fed. Cl. Spec. Mstr. Vowell May 21, 2014) (autism not caused by MMR vaccination); *Pietrucha v. HHS*, No. 00-269V, 2014 WL 4538058 (Fed. Cl. Spec. Mstr. Hastings Aug. 22, 2014) (autism not caused by multiple vaccines); *Bushnell v. HHS*, No. 02-1648, 2015 WL 4099824 (Fed. Cl. Spec. Mstr. Hastings June 12, 2015) (autism not caused by multiple vaccines); *Bokmuller v. HHS*, No. 08-573, 2015 WL 4467162 (Fed. Cl. Spec. Mstr. Hastings June 26, 2015) (autism not caused by multiple vaccines); *Canuto v. HHS*, No. 04-1128, 2015 WL 9854939 (Fed. Cl. Spec. Mstr. Hastings Dec. 18, 2015) (autism not caused by DTP and DTaP vaccines); *Valle v. HHS*, No. 02-220V, 2016 WL 2604782 (Fed. Cl. Spec. Mstr. Hastings April 13, 2016) (autism not caused by DTaP vaccine); *Hooker v. HHS*, No. 02-472V, 2016 WL 3456435 (Fed. Cl. Spec. Mstr. Hastings May 19, 2016) (autism not caused by multiple vaccines).  Judges of this court have affirmed the practice of dismissal without trial in such cases.  *E.g.*, *Fesanco v. HHS*, 99 Fed. Cl. 28 (2011) (Judge Braden affirming); *Canuto v. HHS*, No. 04-1128V, 2016 WL 2586510 (Judge Yock affirming).

In none of the rulings since the test cases has a special master or judge found any merit in an allegation that any vaccine can contribute to causing autism.[4]

---

[4]     I am well aware, of course, that during the years since the "test cases" were decided, in two cases involving vaccinees suffering from ASDs, Vaccine Act compensation was granted.  But in *neither* of those cases did the Respondent concede, nor did a special master find, that there was any *"causation-in-fact"* connection between a vaccination and the vaccinee's ASD.  Instead, in both cases it was conceded or found that the vaccinee displayed the symptoms of a *Table Injury* within the Table time frame after vaccination.  (See §300aa-11(c)(1)(C)(i); §300aa-14.)

In *Poling v. HHS*, the presiding special master clarified that the family was compensated because the Respondent conceded that the Poling child had suffered a *Table Injury--not* because

# III

# PROCEDURAL HISTORY OF THIS CASE[5]

## A.  Initial proceedings

The Petitioners, Harold Hardy III and Tiffany Ann Hardy-Bell, filed this petition on February 25, 2008, alleging that their minor daughter, HH, was injured by DTaP and Prevnar (pneumococcal) immunizations administered on August 26, 2005. (Petition, ECF No. 1.)  The petition was initially assigned to Special Master Gary Golkiewicz.  In 2008, Petitioners were chastised for failure to file medical records as ordered, but finally filed some records in 2009.

Because this case involved a child who suffered from an autism spectrum disorder (ASD), at Petitioners' request proceedings in the case were stayed until the outcomes of the OAP "test cases" became final, as explained in Section II of this Decision above.

## B.  The Amended Petition

After the conclusion of the autism "test cases," Special Master Golkiewicz issued an order directing the Petitioners to file an Amended Petition that clearly explained their theory of

---

the Respondent or the special master had concluded that any vaccination had contributed to causing or aggravating the child's ASD.  *See Poling v. HHS*, No. 02-1466V, 2011 WL 678559, at *1 (Fed. Cir Spec. Mstr. Jan. 28, 2011) (a fees decision, but noting specifically that the case was compensated as a Table Injury).

Second, in *Wright v. HHS*, No. 12-423, 2015 WL 6665600 (Fed. Cl. Spec. Mstr. Sept. 21, 2015), Special Master Vowell concluded that a child, later diagnosed with ASD, suffered a "Table Injury" after a vaccination.  However, she stressed that she was *not*  finding that the vaccinee's ASD in that case was "caused-in-fact" by the vaccination--to the contrary, she specifically found that the evidence in that case did *not* support a "causation-in-fact" claim, going so far as to remark that the petitioners' "causation-in-fact" theory in that case was "absurd."  *Wright v. HHS*, No. 12-423, 2015 WL 6665600, at *2 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).

The compensation of these two cases, thus, does *not* afford any support to the notion that vaccinations can contribute to the *causation* of autism.  In setting up the Vaccine Act compensation system, Congress forthrightly acknowledged that the Table Injury presumptions would result in compensation for some injuries that were *not*, in fact, truly vaccine-caused.  H.R. Rept. No. 99-908, 18, 1986 U.S.C.C.A.N. 6344, 6359.  ("The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination.  The Committee further recognizes that the deeming of a vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related.")

[5]    A more detailed procedural history of this case was presented in my Decision denying compensation in this case.  *See* 2015 WL 7732603 at *8-11.  Here I lay out only those details relevant to this Decision.

vaccine causation. (Order, filed June 28, 2011.)  On July 29, 2011, Petitioners filed an Amended Petition containing the same claims they had alleged in their initial Petition, along with a new allegation that HH suffered from a "mitochondrial disorder." (Amended Petition, ¶ 22.)

Attached to the Amended Petition was an undated letter from Dr. Stephanie Cave, M.D., the mother of Petitioners' counsel. (Amended Petition, pp.7-8.)  In that letter, Dr. Cave stated that HH "more likely than not became encephalopathic as a result of the August 26, 2005 vaccinations." (*Id.*)

On August 12, 2011, this case was reassigned to the docket of Chief Special Master Patricia Campbell-Smith.

During a status conference held on October 5, 2011, Respondent's counsel indicated that a review of the records did not disclose any support for the allegation that HH had a mitochondrial disorder, or had suffered any seizures, as Petitioners also had alleged.  (Order, filed Oct. 6, 2011.)  Following that conference, Petitioners were ordered to supplement the record with any test results or other medical evidence that supported their allegations concerning mitochondrial disorder and seizures. (*Id.*)  Further, Petitioners were specifically instructed that "any filed expert report would be expected to provide detailed, pinpoint record citations that speak directly to the factual record in this case." (*Id.*)  On November 30, 2011, Petitioners filed a very brief expert report by Dr. Cave. (Ex. 10.)  Dr. Cave alleged that HH had mitochondrial dysfunction, suffered seizures two hours after her vaccinations of August 26, 2005, and "became encephalopathic" as a result of those vaccinations. (Ex. 10, p. 1.)

Upon review of that report, Special Master Campbell-Smith filed an Order noting that there was "a lack of documentary support for the factual allegations that were made in the expert report." (Order, filed Dec. 12, 2011.)  Petitioners were directed to file a supplemental expert report from Dr. Cave that was factually supported by medical records (including exhibit numbers and specific page numbers). (*Id.*)

In response, on January 16, 2012, Petitioners filed a supplemental report from Dr. Cave, identified as "Ex. 10-a."  With a few insignificant changes, that report contained the same statements concerning encephalopathy, mitochondrial dysfunction, and seizures that were previously presented by Dr. Cave.  However, despite the special master's orders, many of the factual allegations in Exhibit 10-a still were not accompanied by any specific citations to the filed medical records.

After reviewing the filed medical records and Dr. Cave's supplemental expert report, Special Master Campbell-Smith issued a lengthy Order, explaining that both the factual record and Dr. Cave's expert report fell short of establishing that the vaccines that HH received on August 26, 2005, caused her alleged encephalopathy and developmental delay. (Order, filed on March 2, 2012, p. 10.)  That Order explained that there was no evidence in the medical records that HH experienced an encephalopathy following her vaccinations. (*Id.*, pp. 2-3.)  Also, there was "no evidentiary support for petitioners' claim that [HH] has a mitochondrial disorder or suffers from seizures." (*Id.*, p. 5.)

In that same order, Special Master Campbell-Smith also observed that Dr. Cave had not proposed a medical theory of vaccine-related causation, and that the doctor lacked specialized

education and training in genetics, neurology, and/or immunology that would give probative weight to her opinions. (*Id.*, pp. 4-5.)  The Order also discussed evidence in the medical record suggesting a pre-natal origin for HH's condition. (*Id.*, pp. 7-8.)  Based on these and other shortcomings in Petitioners' claim, the Order concluded that "the reasonableness of moving forward is in question." (*Id.*, pp. 9-10.)

In light of these deficiencies in Petitioners' claim, they were ordered to file a response indicating how they intended to proceed. (*See* Order, filed March 2, 2012, p. 10; *see also* Show Cause Order, filed April 10, 2012.)  In response, Petitioners filed a Status Report on May 10, 2012, suggesting that they would ask their expert to review the matter.   Thereafter, another Order was issued, which again required Petitioners to show cause why the case should not be dismissed, since they "have not addressed the stated inadequacies with their supplemental expert report." (Show Cause Order, filed May 14, 2012.)

On June 27, 2012, Petitioners filed additional medical records and medical articles (Exs. 23-26), and another supplemental expert report of Dr. Cave (Ex. 10-b).  In that report, Dr. Cave further discussed her opinions concerning mitochondrial dysfunction and alleged symptoms of encephalopathy. (*Id.*, pp. 4-8.)  Within the context of that discussion, Dr. Cave suggested that "the case could be considered a Vaccine Table Case." (*Id.*, p. 14.)

Petitioners filed a Status Report on June 28, 2012, indicating their desire to proceed to an evidentiary hearing.   On July 6, 2012, Special Master Campbell-Smith issued an Order stating that the special master's concerns about various issues still persisted.   Nonetheless, in preparation for a hearing, Respondent was ordered to file an expert report. (Order, filed July 6, 2012.)  On October 5, 2012, Respondent filed the expert opinion of Dr. Max Wiznitzer, M.D. (Exhibit A.)

On April 3, 2013, counsel for both parties participated in a status conference to discuss how this case would proceed.  Special Master Campbell-Smith filed another lengthy Order reiterating that the factual allegations made by Dr. Cave concerning the existence of symptoms of a "Table encephalopathy" or seizures could not be confirmed by contemporaneous medical records.  (Order, filed April 8, 2013, pp. 1-3.)  That Order noted that only the retrospective accounts of the parents supported Dr. Cave's assumed history of HH's condition, and that the special master declined to base her factual determinations on those unsubstantiated claims. (*Id.*)  The Order also noted that Dr. Cave possessed far less of the specialized training needed to offer "an opinion on the neurological aspects of this matter," compared to a pediatric neurologist, such as respondent's witness, Dr. Wiznitzer.  (*Id.*, p. 5.)

On April 9, 2013, this case was reassigned to my docket due to the imminent appointment of Special Master Campbell-Smith as a judge of this Court. (ECF No. 48.)

Petitioners filed yet another supplemental report from Dr. Cave, on May 29, 2013, acknowledging that she could not support a finding that HH suffered a Table encephalopathy, or that she had suffered post-vaccination seizures, without relying on the statements of HH's parents.  (Ex. 27, p. 1.)  Following these concessions, Dr. Cave's supplemental report asserted that HH suffered from a mitochondrial dysfunction, which allegedly made her vulnerable to injury due to the effects of aluminum, a vaccine adjuvant. (*Id.*, pp. 4-5.)  In that report, Dr. Cave stated,

"The patterns of [HH's] developmental delay may have been determined by genetics or prenatally determined, but it is *possible* that mitochondrial dysfunction did either exacerbate or increase the severity of the delay."

(Ex. 27, p. 4, emphasis added.)

Petitioners indicated that they wanted to move forward with an evidentiary hearing. (Status Report, filed June 26, 2013.)  During a status conference on July 2, 2013, Petitioners stated their intention to proceed to a trial consisting of expert testimony, but stated that it would not be necessary to present their own personal testimony.  (Order, filed July 8, 2013.)

### C.  Hearing and Decision

An evidentiary hearing was held on February 7, 2014, in which Dr. Cave was the sole expert for Petitioners, and Dr. Max Wiznitzer, a pediatric neurologist, testified for Respondent.

After post-hearing briefing, on November 3, 2015, I filed my Decision denying Petitioners' claim for Program compensation. (ECF No. 76.)  That decision will be discussed in detail in Section IV of this Decision below.  Petitioners did not seek review of that Decision, so that judgment denying their claim was entered on December 4, 2015. (ECF No. 78.)

### D.  Petitioners' application for fees and costs

On June 1, 2016, Petitioners filed an application seeking attorneys' fees and costs incurred in their attempt to gain compensation in this proceeding. (ECF No. 79.)  They seek a total of $41,552.54 in fees and costs.  Respondent filed a short Response on June 13, 2016, arguing generally that I should award a reduced amount, but offering no substantial analysis of the application.  (ECF No. 80.)  The Respondent took the position that the Vaccine Act does not contemplate a "role for respondent in the resolution of a request by a petitioner for an award of attorneys' fees and costs" (*id*., p. 1), and requested that the special master "exercise his discretion" in determining a reasonable award (*id*., p. 4).

On July 8, 2016, I issued an Order informing Petitioners' counsel that I was considering, *sua sponte*, the issue of whether there was a "reasonable basis" for Petitioners to pursue this case to an evidentiary hearing.  I cited my Decision in *Miller v. HHS*, No. 02-235V (Fed. Cl. Spec. Mstr. June 3, 2016.)  I allowed the Petitioners to file a brief addressing that issue within 30 days of the date of that order.  Petitioners filed their brief addressing the "reasonable basis" issue on August 8, 2016.

# IV

# MY DECISION CONCERNING PETITIONERS' COMPENSATION CLAIM IN THIS CASE

I rejected the Petitioners' claim for compensation, in a Decision filed on November 3, 2015. *Hardy v. HHS*, No. 08-108V, 2015 WL 7732603 (Fed. Cl. Spec. Mstr. Nov. 3, 2015.)  In that Decision, I provided a lengthy discussion of why I denied the Petitioners' claim, but I will highlight a few of those points here.

## A. General deficiencies in Dr. Cave's qualifications and Mr. Cave's presentation

I found that, in general, Dr. Cave's and Mr. Cave's presentations were poorly developed and quite unpersuasive.  I noted first that it was never even completely clear exactly what Petitioners were arguing in this case.  For example, Petitioners and Dr. Cave were not even clear as to *what vaccinations* they alleged to have harmed HH.  Further, the allegations stated by Petitioners in their Post-Hearing Memorandum did not always correspond to Dr. Cave's testimony. (2015 WL 7732603 at *15, 17.)

Next, I found Respondent's expert, Dr. Wiznitzer, to be far more persuasive than the expert upon whom Petitioners relied, Dr. Cave.  While Dr. Wiznitzer is a board-certified pediatric neurologist, one of the two medical specialties (along with psychiatry) most closely related to autism, Dr. Cave is board-certified only in the area of family practice. (2015 WL 7732603 at *16.)  Dr. Wiznitzer has received extensive academic training and has academic credentials relating to autism, headed a major autism center for 18 years, and has written several textbook chapters devoted to ASDs and related disorders.  While Dr. Cave has spent much of her career treating children with ASDs, with respect to her *academic credentials* and *special medical training* concerning *autism*, her overall qualifications for opining concerning the causation of *autism* are quite weak. (*Id.*) (The prior special master in this case, Special Master Campbell-Smith made similar comments concerning the comparative credentials of the two experts. ECF No. 47, p. 3.)

I also found a vast gap between the two experts' *ability to explain* their opinions.  The written reports and hearing testimony of Dr. Wiznitzer seemed to me to be coherent and logical.  In contrast, the written reports of Dr. Cave were not well explained and contained significant factual errors, while her hearing testimony was often poorly explained, self-contradictory, and less than logical. (2015 WL 7732603 at *16-17.)

Further, I noted that Dr. Cave seemed at times to be *very unsure* of her "causation" conclusion.  For example, Dr. Cave stated that "[t]he patterns of [HH's] developmental delay may have been determined by genetics or prenatally determined, but it is *possible* that mitochondrial dysfunction did either exacerbate or increase the severity of the delay." (Ex. 27, p. 4, emphasis added.)  Thus, according to Dr. Cave herself, it is only *possible* that a mitochondrial dysfunction contributed to HH's condition.  During the hearing Dr. Cave also testified that --

> *"[i]t's not really clear* whether or not [HH] had a genetic problem or whether it was something that was caused or exacerbated by an environmental toxin."

(Hearing Tr. at p. 33.)

12

Moreover, I concluded that while Dr. Cave relied on her (erroneous) belief that HH suffered from a "mitochondrial dysfunction," Dr. Cave made no serious attempt to explain why such a circumstance would therefore tend to show that *vaccinations* either initially caused or aggravated HH's neurodevelopmental disorder. Dr. Cave did not present any *explanation* of her theory that the presence of "mitochondrial dysfunction" would make an infant more susceptible to the unspecified "toxins" in unspecified vaccines. She simply did not explain her theory in this regard in any detail. (2015 WL 7732603 at *17.)

### B. Dr. Cave's reliance on alleged occurrences <u>not</u> substantiated by the medical records

Next, I found a glaring failure of Dr. Cave to base her opinions on HH's medical records. Dr. Cave's opinion was, in fact, *contradicted* by those medical records. (2015 WL 7732603 at *18.) In this regard, I noted that Dr. Cave's early reports in this case were *not* based on HH's medical records; rather, they were based on the *parents' retrospective accounts* of events and symptoms that were *not* reported in HH's medical records. I found those parental accounts to be unreliable after comparison to the medical records. As noted above, the prior presiding special master in this case, Special Master Campbell-Smith, ordered Petitioners to file supplementary expert reports with specific citations to the medical records, but Dr. Cave repeatedly failed to do so, and eventually acknowledged that she could *not* support her causation theories without relying *entirely* on the statements of HH's parents. (*Id*.)

In this regard, I found Dr. Cave's presentation in this case to be particularly unreasonable because in prior Vaccine Act cases, she had been advised that causation conclusions that are not based on medical records would be in grave danger of rejection for that reason. In *Berge v. HHS*, No. 08-223V, 2010 WL 3431601 (Fed. Cl. Spec. Mstr. Aug. 2, 2010), the special master dismissed the case largely because, "[i]n light of Dr. Cave's report being premised upon information supplied by the parents, without discussing the medical records at all, that opinion is rejected as without factual predicate." *Id*. at *2 (citation omitted). In another case, the presiding special master observed that "[d]ue to 'a lack of documentary support for the factual allegations' in Dr. Cave's report, the special master ordered petitioners to file a supplemental report, referencing the exhibit and page number of records supporting her factual assertions." *Blake v. HHS*, No. 03-031V, 2014 WL 2769979, at *3 (Fed. Cl. Spec. Mstr. May 21, 2014) (describing an order issued in that case *in 2011*). Thus, in prior cases in 2010 and 2011, Dr. Cave was made aware of the necessity to substantiate her factual allegations in Vaccine Act cases by citing the medical records, but nevertheless she failed in this regard in this case. (2015 WL 7732603 at *18.)

Further, in this case Dr. Cave's opinions regarding HH's alleged "Table Injury encephalopathy," the alleged vaccine causation-in-fact, and the alleged vaccine-caused aggravation of a previous condition, were all based primarily on the following assumption of fact: that HH experienced a "severe adverse event," including "seizures" and a dramatic alteration in her development, *within a day* after her vaccinations of August 26, 2005. (Ex. 10, p. 1; Tr. 15.) However, I concluded that HH's medical records *contradict* Dr. Cave's assumption that HH experienced seizures, or a "severe adverse event," or a dramatic change in her development, within the 24-hour period post-vaccinations. (2015 WL 7732603 at *19.) For example, the medical records indicate that HH was not brought to any health provider until *12 days later*, on September 7, 2005. And at that September 7 visit her mother did *not* report that

HH had displayed any seizure-like behaviors, or experienced either a severe adverse event or a sudden behavioral change, either within 24 hours of the vaccinations on August 26, or at any time in the meantime. (*Id.*)

### C. Petitioners' "Table Injury" claim was completely without merit.

The first part of Petitioners' argument for a Vaccine Act award was their claim that HH suffered a "Table Injury encephalopathy."  However, I found that the record as a whole, particularly the contemporaneous medical records, made it quite clear that HH did *not* suffer a "Table Injury encephalopathy" in temporal proximity to the vaccinations administered on August 26, 2005.  I set forth the applicable definition of a "Table Injury encephalopathy," and explained why the contemporaneous records make it clear that HH did *not* suffer an injury falling within that definition. (2015 WL 7732603 at *19-23.)

### D. Petitioners' "causation-in-fact" arguments were similarly without merit.

Next, I examined Petitioners' "causation-in-fact" arguments, and found that Petitioners also failed completely to demonstrate that HH's vaccinations of August 26, 2005, played any role in either *initially causing*, or *aggravating*, her neurodevelopmental disorder. (2015 WL 7732603 at *23-29.)

Again, Dr. Cave's causation-in-fact opinion was based upon alleged occurrences *not substantiated* by the medical records. (2015 WL 7732603 at *23.)  Second, Dr. Cave erroneously neglected to recognize that HH was suffering from her neurodevelopmental disorder *prior* to the vaccinations of August 26, 2005. (*Id*. at *23-25.)  Concerning this point, Dr. Cave blatantly disregarded extensive evidence in the medical records of HH's abnormally small head size during the first months of life. (*Id*. at *24-25.)

Dr. Cave also based her causation opinions on a mistaken conclusion that HH was suffering from "mitochondrial dysfunction."  Concerning this point, I found that Dr. Cave's analysis again was completely muddled. (2015 WL 7732603 at *25-28.)  I found that both Dr. Cave's understanding of mitochondrial disorders in general, and her understanding of the "Morava criteria" for evaluating the possibility of a mitochondrial disorder, were highly questionable, and that she displayed a distinct lack of knowledge concerning that subject area. (*Id*. at *26.)  I concluded that she totally misapplied the Morava criteria to the case of HH. (*Id*. at *26-27.)

In short, I found that Petitioners' entire presentation concerning "causation-in-fact" was generally vague, unclear, often self-contradictory, and far from persuasive.  Dr. Cave relied completely upon a *misassumption* of fact, and also misanalyzed the evidence that shows that HH had a serious neurodevelopmental problem *prior* to the vaccinations in question.  And while Dr. Cave based her causation theory on the proposition that HH suffered from a "mitochondrial dysfunction" or "mitochondrial disorder," she in fact seriously misanalyzed the evidence in that regard too, so that there is no good reason to believe that HH *even had* any type of mitochondrial dysfunction or disorder.

Finally, I noted that even if one were to assume for the sake of argument that HH *did* suffer from some kind of mitochondrial dysfunction or disorder, Dr. Cave made no serious

attempt to explain *why* such a circumstance would therefore tend to show that *vaccinations* either initially caused or aggravated HH's neurodevelopmental disorder.

V

**DETERMINATION CONCERNING "REASONABLE BASIS"**

*A. Introduction*

In the following pages I conclude, considering the overall record of this case and the course of the OAP, that there was a reasonable basis for *filing* the petition and pursuing it somewhat past the point where the OAP "test cases" (*see* Section II of this Decision above) became final, but that, at a certain point, there was *no longer* a reasonable basis to continue pursuing this claim. Accordingly, I will award no fees and costs incurred beyond that point.

*B.  There __was__ a reasonable basis to file and pursue this case __prior__ to the decision to engage Dr. Cave as the testifying expert.*

As set forth above in Section II of this Decision, in the early 2000s major controversies arose as to whether autism spectrum disorders might be caused or otherwise affected by either MMR vaccines or thimerosal-containing vaccines. Therefore, thousands of parents filed Vaccine Act claims during the early 2000s alleging that their children's ASDs were vaccine-caused. I and other special masters have found that those claims were brought in good faith. Further, given the scientific uncertainty at the time, I find that the *filing* of this *particular* petition in 2008, along with others like it, was reasonable. It was also reasonable to keep such claims, including this one, pending until the OAP "test cases" became final in 2010, and for some period of time thereafter, in order for counsel to digest the complicated science, and to consult with qualified experts to see if a reasonable basis to go forward with the claims could be found. Accordingly, I will compensate counsel in this case for his reasonable efforts in filing the petition, and for his efforts up until the time, in 2011, that he chose an unqualified expert, his own mother, to become his expert witness.

*C.  There __no__ reasonable basis to pursue this case __subsequent__ to the decision to engage Dr. Cave as the testifying expert.*

As demonstrated by the summary of my Decision set forth above, it is abundantly clear that Petitioners' counsel and Dr. Cave presented an extremely defective claim in this case. I have reviewed Dr. Cave's expert reports and other filings, Dr. Cave's testimony during the evidentiary hearing, and the many filings of Mr. Cave on Petitioners' behalf, including his post-hearing memorandum. I conclude that Petitioners' and Dr. Cave's pre-hearing, hearing, and post-hearing arguments were extremely poorly developed and presented -- to the point of being, in essence, frivolous.

I have found, for example, that Dr. Cave, certified in family medicine but without any special training or qualifications pertinent to the main issues in this case -- *i.e.*, whether a "Table Injury encephalopathy" took place, whether HH suffered from a mitochondrial disorder, or the

15

causation of autism spectrum disorders -- was unqualified to present a persuasive opinion in this case. (2015 WL 7732603, at *15-16.)

I have found that the presentations of both Dr. Cave and Mr. Cave were based upon a serious misreading and/or a disregard of the medical records pertaining to HH. For example, the medical records do not support Dr. Cave's key assertion that HH suffered a serious adverse event, including seizures and a dramatic alteration in her development, within a day after her vaccinations of August 26, 2005. (2015 WL 7732603 at *19.)

I have found that Dr. Cave's testimony about an alleged "mitochondrial dysfunction" in HH was confused and plainly incorrect. (2015 WL 7732603 at *25-28.) As noted in my Decision, Dr. Cave's testimony concerning that issue indicated a basic lack of understanding on her part concerning the nature of mitochondrial disorders, and the factors involved in diagnosing such disorders. (*Id*. at *26-28.)

Further, I have found that Mr. Cave's and Dr. Cave's argument that HH suffered a "Table Injury encephalopathy" was completely contradicted by the medical records, and completely devoid of merit. 2015 WL 7732603, at *19-23.

In short, I have found that the Petitioners' entire case, as presented through Dr. Cave, was completely unpersuasive.

Accordingly, in light of all the gross deficiencies in Petitioners' case described above, I come inevitably to the conclusion that there was *no reasonable basis* for Petitioners' counsel to go forward with this extremely weak case, subsequent to his decision in 2011 to engage Dr. Cave as Petitioners' testifying expert. The only reasonable course for Petitioners' counsel at that time, given the facts in the medical record, and if the only expert that he could obtain was Dr. Cave, would have been either to persuade Petitioners to abandon their claim, or, failing that, to withdraw from the case. For Mr. Cave to incur the expense of Dr. Cave's defective reports, then to push this case forward to an evidentiary hearing on the basis of theories that were so unpersuasive, and so contrary to the actual medical records of HH, was simply not reasonable.

Adding to the lack of reasonable basis in this case is that mid-2011, when Mr. Cave solicited the report of Dr. Cave, there were *several strong indications*, of which Mr. Cave was aware, that he was retaining an underqualified and unpersuasive expert. For example, in *Nilson v. HHS*, No. 98-797V, 2005 WL 6122524 (Fed. Cl. Spec. Mstr. Aug. 31, 2005), Special Master Sweeney (now Judge Sweeney) compared the expert reports and testimony of Dr. Cave and Dr. Wiznitzer regarding several disputed issues, and found that Dr. Wiznitzer's opinion on each was more credible. *Id*. at *17-20. The special master concluded that "[i]n this case, Dr. Cave's theories of causation were effectively rebutted by a highly-credentialed pediatric neurologist, Dr. Wiznitzer, whose testimony was far more credible and compelling." *Id*. at *20. In *Berge v. HHS*, No. 08-223V, 2010 WL 3431601 (Fed. Cl. Spec. Mstr. Aug. 2, 2010), Special Master Golkiewicz dismissed the case largely because "Dr. Cave's expert report being premised upon information supplied by the parents, [without discussing] the medical records at all, that opinion is rejected as without factual predicate." *Id*. at *2 (citation omitted). Thus, by 2010 Mr. Cave and Dr. Cave were aware that Vaccine Act special masters had not found Dr. Cave to be a persuasive witness, *and* that Dr. Cave needed to *substantiate* her factual allegations in Vaccine

Act cases by citing the *medical records*, which she failed to do in this case. Thus, the *Nilson* and *Berge* opinions demonstrate that by 2011 Mr. Cave should have been aware that Dr. Cave was *not* a credible witness for this case.

In addition, adding even further to the lack of reasonable basis, is the history of the *many orders* that Mr. Cave was given by Special Master Campbell-Smith in this very case, *plainly warning him* of serious deficiencies in his case. As set forth in detail above in Section III of this Decision, that special master issued orders of that nature on October 6, 2011; December 12, 2011; March 2, 2012; and July 6, 2012. All of those orders clearly should have indicated to Mr. Cave that it would be unreasonable to continue pursuing the case. And one of those orders even *explicitly warned* Mr. Cave that "the reasonableness of moving forward is in question." (Order of March 2, 2012, pp. 9-10.)[6]

And, of course, those Orders also indicate that Special Master Campbell-Smith in 2011 seems to have reached the *same conclusion* that I do in this Decision -- *i.e.*, that there was no reasonable basis for Mr. Cave to proceed further with this case.

In summary, by mid-2011, when he apparently engaged Dr. Cave as his expert witness in this case (her first letter as an expert was filed on July 19, 2011), Mr. Cave should have known that it was *not reasonable* to proceed as he did from that point forward. It was not reasonable to proceed further in light of the Omnibus Autism Proceeding "test case" decisions, described above. It was not reasonable to proceed with a causation theory based upon the vaccinations of August 26, 2005, when HH's medical records showed (1) no sign of a reaction *soon after* those vaccinations, and (2) strong evidence of a serious neurodevelopmental disorder *prior* to those vaccinations. It was not reasonable to engage an expert witness, his own mother, who had previously been shown to be an unpersuasive witness with a tendency to disregard the medical records.

Thus, it was not reasonable for Mr. Cave to proceed beyond mid-2011 with this case, and it is therefore not reasonable for Mr. Cave to expect to be compensated, using Vaccine Act funds, for his unwise decision to push this case forward to an evidentiary hearing and decision.[7]

---

[6]      In *Blake v. HHS*, No. 03-31V, 2014 WL 2769979 (Fed. Cl. Spec. Mstr. May 21, 2014) the presiding special master (Vowell) issued a warning order very similar to the Orders filed in this case. On February 15, 2012, the petitioners in *Blake* were advised concerning "Dr. Cave's lack of expertise in the relevant specialties of developmental pediatrics, pediatric neurology, or pediatric immunology." *Id*. at *3. Eventually, eligibility for an award was denied in *Blake*, largely due to Dr. Cave's lack of qualifications to opine as petitioners' expert. *Id*. at *15.

[7]      I also note that in *Mooney v. HHS*, No. 05-266V, 2014 WL 7715158 (Fed. Cl. Spec. Mstr. Dec. 29, 2014), Special Master Vowell declined to award costs for the production of Dr. Cave's expert opinion, awarding only a small amount for "consultation" services, and added that "I am unlikely to authorize Dr. Cave's consultant fees for hearing preparation in any similar cases filed by Mr. Cave." *Id*. at 14.

# VI

## PETITIONERS' ARGUMENTS

In their "Response" filed on August 8, 2016 ("Response"), Petitioners' counsel presented arguments concerning "reasonable basis." I have carefully considered Petitioners' arguments in that regard. I have taken those arguments into account in reaching my findings concerning "reasonable basis" in Section IV of this Decision.

### A. *Argument concerning a different case*

First, Petitioners, rather curiously, presented arguments concerning a *different case* in which I found that Mr. Cave had no reasonable basis to take a similar case to trial. (Response, pp. 1-2.) That case was *Miller v. HHS*, No. 02-235V, 2016 WL 3746160 (Fed. Cl. Spec. Mstr. June 3, 2016). In that case, Mr. Cave attempted to seek review of my Decision, but failed to file his motion for review on time, and Chief Judge Campbell-Smith dismissed his review motion. *Miller v. HHS*, No. 02-235V (Chief Judge Campbell-Smith dismissing motion for review on July 8, 2016) (unreported Order). Obviously, Mr. Cave's arguments concerning the *Miller* case are irrelevant to this case.

### B. *Alleged "factual distinctions" from autism test cases*

Second, Petitioners argue that this case has some "factual distinctions" from the autism "test cases" cited above in Section II. (Response, pp. 1, 3.) Of course, no two cases involving autism are exactly alike in all factual areas. Moreover, most of Petitioners' specific arguments in this regard make it seem that Mr. Cave has never even read my Decision denying Petitioners' claim for Vaccine Act compensation. For example, Mr. Cave begins by asserting that "(1) [HH's] medical records show regression following administration of the vaccines; (2) There was evidence of HH having seizures and convulsions following vaccine administration; (3) The autism test cases did not involve *** someone with mitochondrial dysfunction." (*Id.*, p. 3.) But I carefully examined the record of this case, and concluded that HH's medical records *strongly contradicted* the Petitioners' assertions that HH experienced seizures, regression, or any kind of serious adverse event soon after her vaccinations in question, which were administered on August 26, 2005. (2015 WL 7732603 at *19.) I also concluded firmly that Dr. Cave had failed *by far* to demonstrate that HH suffered from any type of "mitochondrial dysfunction." (*Id.* at *25-28.)

More importantly, these arguments concerning "factual distinctions" between this case and the OAP test cases are simply not relevant to my reasoning concerning "reasonable basis" in this case. Here, my analysis concerning "reasonable basis" does *not* conclude that *no case* involving an individual with an autism spectrum disorder (ASD) can ever have a reasonable basis after the test cases. To the contrary, in a number of cases tried and decided since the test cases, I have found that the petitioner *did* have a reasonable basis to proceed to an evidentiary hearing, even though that hearing proved to be unsuccessful for the petitioner. My analysis in this case, set forth above, is merely that the specific arguments actually put forth by Mr. Cave and Dr. Cave at the evidentiary hearing *in this case* were so muddled, so scientifically weak, and

18

so divorced from the actual facts contained in HH's medical records, that in effect Petitioners' case, as presented, was simply frivolous.

I also found that it was unreasonable *in this particular case* for Mr. Cave to proceed to trial with an expert witness who was not only his own mother, but whose testimony in prior cases had previously been rejected and criticized as wholly unpersuasive.

### C.  My comments to Dr. Cave at the conclusion of the evidentiary hearing

At two points in his memorandum (Response, pp. 3, 25-26), Mr. Cave quotes a portion of the comments I made to Dr. Cave at the conclusion of the evidentiary hearing, namely:

> I wanted to say that the last part of your presentation, Dr. Cave, was moving in the way that you are dedicated to your patients and are doing everything you can to help them and believe that you're helping them.  That was good to hear.

(Tr. at 171.)  I was sincere in those comments.  From listening to Dr. Cave's presentation, I concluded that Dr. Cave sincerely cares for her patients, and sincerely believes (likely erroneously) that vaccines can in some cases cause or aggravate autism.

However, just because I believe that Dr. Cave is *sincere*, does not mean that I think that there is *any validity whatsoever* in her views concerning the potential for vaccines to contribute to causing autism.  To the contrary, as set forth at length in my Decision filed in 2015, I found that her scientific arguments were *woefully wrong*, and that she willfully disregarded the medical records in this case in order to reach her misguided conclusions.

Thus, my statement commending Dr. Cave's apparently sincere concern for her patients does *not* conflict with my conclusion that there was no reasonable basis for Mr. Cave to hire Dr. Cave as his expert, and to take this case to an evidentiary hearing.

### D.  The rest of Petitioners' arguments

In the balance of Petitioners' memorandum, Mr. Cave simply rehashes the specific arguments that he and Dr. Cave presented at the evidentiary hearing, and in Mr. Cave's post-hearing brief.  However, I completely rejected those arguments *in detail* in my Decision of November 3, 2015, and summarized my reasoning in that regard again in the pages above in *this* Decision.  Mr. Cave's rehash of his terribly weak and unpersuasive arguments do not in any way persuade me that Petitioners had a "reasonable basis" to pursue this case past mid-2011.

In short, I have reached the conclusions concerning "reasonable basis" set forth in Section V above, after carefully considering the arguments of Petitioners' counsel in his Response filed on August 8, 2016.

# VII

## NOTATION CONCERNING "REASONABLE BASIS" IN AUTISM CASES IN GENERAL

As discussed above in Section II of this Decision, in the early 2000s controversies arose concerning whether autism spectrum disorders might be caused or affected by vaccines.  Thus, thousands of Vaccine Act claims were filed during those years alleging that ASDs were vaccine-caused.  These claims were certainly brought in good faith.  Further, in light of the scientific uncertainty at the time, I find that the *filing* of those petitions was reasonable.  It was also reasonable to keep such claims pending until the OAP "test cases" became final in 2010, and for some period of time thereafter, in order for counsel for each petitioner to digest the complicated science, and to consult with experts to see if a reasonable basis to go forward could be found.

However, by the end of 2010, the two major theories concerning vaccine-causation of autism had been thoroughly considered and rejected in the OAP test cases, with opinions that, among other things, found that *all* of the many reputable epidemiological studies had found *no association* between any vaccines and autism.  At that point, the vast majority of the approximately 5,000 autism petitioners elected either to withdraw their claims, or to request that the special master enter a decision denying their claim on the written record.  Only a small minority of the autism petitioners elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses.  Since 2010, a number of such cases have gone to trial before special masters, and in the cases of this type decided thus far, *all* have resulted in *rejection* of petitioners' claims that vaccines played a role in causing or aggravating their child's autism or autistic symptoms.  See the cases cited above in Section II.

There is now, therefore, a serious question concerning whether it is reasonable for additional Vaccine Act petitioners to continue to pursue highly speculative theories concerning vaccinees with autism spectrum disorders.  In each such case, of course, a case-specific decision must be made concerning if and when it became unreasonable, under all the circumstances of the case, to continue to go forward.  In many of the cases decided since 2010, petitioners have tried to avoid the conclusions of the test cases by alleging that a child suffered a vaccine-caused "encephalopathy" that resulted in "autistic-like features," or that a child had an underlying "mitochondrial disorder" that somehow made the child more vulnerable to injuries by vaccines, or that an "autoimmune" process was involved.  But all such cases, in essence, have amounted to attempts to prove that vaccines can cause or aggravate *symptoms of ASDs*.  And, except for the two highly unusual Table Injury cases described at footnote 4 above, all such theories have been *rejected*.

Further, a review of the post-test case decisions enumerated in Section II above demonstrates that those cases typically involved expert witnesses who were quite underqualified to opine on the vaccine-causation issues at hand, and/or presented theories with no substantial scientific merit, and/or disregarded the facts contained in the medical records of the case.

Accordingly, I hereby put counsel, especially in autism-related cases, on notice, once again, that if counsel continue to go forward with such extremely weak cases, I am *not* likely to find that there was a reasonable basis for their continued prosecution of the case.

# VIII

## CALCULATIONS OF FEES AND COSTS AWARDED

### A.  Attorney's hourly rates

Attorney Cave has practiced law since 1999.  In this case, he seeks compensation at the hourly rates of $181 for 2006; $186 for 2007; $193 for 2008; $248 for 2009; $253 for 2010; $261 for 2011; and higher amounts for 2012 to 2015. (ECF No. 84-2.)  The rates for 2006 – 2011 are the same as or quite similar to the rates that Special Master Vowell granted to him for those years in the case of *Mooney v. HHS*, 2014 WL 7715158, at \*9.  I find those claimed rates to be reasonable.  I will compensate Mr. Cave at his claimed rates from 2006 through 2011.

### B.  Attorney hours in general

I find reasonable the number of hours Mr. Cave billed for 2002 through 2010.  As to the hours billed for 2011, I will compensate Mr. Cave for the hours billed from the beginning of that year through July 5, 2011.  Based on Mr. Cave's billing records, however, it appears that about that time Mr. Cave solicited an expert report from Dr. Cave, which he "reviewed" on July 27, 2011. (ECF No. 79-4, p. 3.)  I will not compensate Mr. Cave for the hours after July 5, 2011, for the reasons cited above -- *i.e.*, as explained, I find *no reasonable basis* for Mr. Cave to solicit an expert report from Dr. Cave, and I find *no reasonable basis* for the claim for Vaccine Act compensation that Mr. Cave and Dr. Cave put forward after that time.

### C.  Summary of attorney hours

Utilizing Mr. Cave's summary in his fees application (ECF No. 79-4, p. 8), I award him the fees requested for 2006 through 2010, which total $7,006.13.  For 2011, I award him fees for the hours claimed through July 5, 2011.  (1 hour times $261 per hour = $261.)

### D.  Costs

Of the costs claimed at ECF No. 79-4, p. 10, I allow only the $250 for the filing fee paid in 2008, and the $102.71 mailing charge incurred in 2009.  I deny the other costs claimed, as they were all incurred after July 5, 2011. (ECF No. 79-4, pp. 12-19.)  (Those denied costs consisted largely of $12,250 paid to Dr. Cave.)

### E.  Summary

As explained above, I award Petitioners $ 352.71 in costs; $ 7,006.13 for Mr. Cave's services in 2006-2010; and $261 for Mr. Cave's services in January through July 5, 2011, for a total award of $ 7,619.84.

## IX

## CONCLUSION

For the foregoing reasons, I award Petitioners $7,619.84 in attorneys' fees and costs. The award shall be made in the form of a check payable jointly to Petitioners and Petitioners' counsel. The Clerk of this Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

<u>/s/ George L. Hastings, Jr.</u>
George L. Hastings, Jr.
Special Master